I would like to begin with the wiretap issues and I would also respectfully ask for five minutes in rebuttal to reserve that time. Beginning with the oath requirement, the thing that's most important to remember is that under section 2516 subsection 3 of title 18, the application as opposed to the affidavit has to be presented by an attorney. The requirement is that an attorney present that, not a police officer. So the Third Circuit case of Williams is distinguishable because in that case it was a Pennsylvania State Police case where it was a district attorney matter and the laws of the state of Pennsylvania were different from the federal laws. However, they did conclude at the end that the attorney involved was implicitly representing his belief that there was probable cause and necessity for the electronic surveillance and that was an important administrative check. In this particular case, there's no question that Special Agent Copin could not just on his own present a wiretap application to the district court. There's no question that I agree with that. The concern, this is very odd. Isn't Samantha Phillips now a judge in the Superior Court? That's right. Okay, so the argument is that Rosenberg, not Jesner, signed the wiretap application and that is a violation of the requirements because since she's making it on her personal knowledge, she has to sign it. Well, not only that, the application has her name on it. Right. The application identifies her as the law enforcement officer under 2516.3 who is making the application. She's representing or the document is representing that Phillips Jesner is the one who has done all the investigation, has made the connections with the Department of Justice, Maine Justice Office of Electronic Enforcement Operations to get the requisite approvals there under 2518.1. Let me just go to a tinier point. So everyone agrees that a person named Rosenberg signed this, but if you look at the signature page on the excerpt of records of 2184, there's not a Rosenberg that signed this. It's like a Kelly, E, R. Do you have that? I saw the signature. It's not terribly legible, and my assumption was that he did sign it, and he also made the interlineation on an earlier page to correct something ministerial in the application. There may be his initials there, which would be K.R. It says, I set forth herein. It says K.S.R. Right, so Kevin S. Rosenberg. And it was before Judge King who was actually presiding over the application for Judge Collins. Yeah, actually, yeah, I thought Judge Collins authorized it. Well, no, it's a signature on behalf of Collins. We're not raising an issue as to that. We're only saying that Rosenberg can come in as a proxy because Jessner was somewhere else and say, here's the application, and I'm ready to swear to it or she swore to it or whatever because she's not there. Is there any law in the Ninth Circuit that supports that argument? It's really actually, it appears to me to be a matter of first impression. There's nothing that's specifically on point that deals with the application. It's really troublesome. I know Judge McGeehan probably also did, but I signed a number of wiretap authorizations, and I don't think I would have let this get by me. No, no. And I've done this to court. No, and I wouldn't either, and I was in the U.S. Attorney's Office for 17 years, and I was the Deputy Chief of Narcotics, and I did a lot of wiretaps, and I would have never let this happen either. And the argument that Kepner suffices is completely erroneous because one of the other statutory requirements is that the authorization for interception order application has to be attached to the declaration by the attorney in the application. And nowhere does Kepner identify the authorizing DOJ officer or attach the requisite authorization. So that was not attached to Kepner's. That was attached to Jessup's. Jessup's. That's right. Yeah, the authorization page that you get from the Attorney General or the Assistant Attorney General. She appeared before me with Samantha Phillips. That's why I keep hearing the name. Right. It used to be Phillips, and then it became Jessup when she got married to another AUSA, and they both left the office. But at the time, she was still at the office. So she should have been the one that was presenting the application to the court. Now, okay, let's just – there's all these technical – I mean, statutory violations here. Right. But what do you make of the cases that say as long as the substance of the whole application is there and the various pieces are there that – I think – I can't remember the names of the cases. There's two cases to start with. But that it's just a technicality. Well, it's not really a technicality because 251810AI, under the Giordano Supreme Court decision, said that the violations are not limited to constitutional violations. They also apply the statutory requirements that, quote, So then you say, well, is this just some ministerial act that was overlooked? Or does this really go to the heart of what's required by Congress, by the Senate report that's also mentioned in a number of these decisions as being something that is essential? The statute in Congress really contemplated that the person making the application have the firsthand personal knowledge of the investigation. Right. That's right, personal knowledge. And so AUSA Rosenberg at that time didn't have any knowledge of the case. But we can see there's nothing in the record – Isn't the statute that it has to be someone who's authorized to present an application? Yes. And that can be an AUSA or any law enforcement officer. It can be an attorney under 2516. Okay. Not a law enforcement officer. Okay. Couldn't Mr. Rosenberg have simply scratched out Ms. Jessner's name and put his name there? He was authorized to present applications. He was, but everything that's contained in the application itself, it talks about not only the fact that he would be authorized, but things that he's done in furtherance of the application process, which means that he has had meaningful contact with the important parties in Washington. He has worked with the investigators. He has personal knowledge of the investigation. In other words, somebody who doesn't have any knowledge of the investigation can't just put their name on the application and walk it through because they're an attorney working in the office. There's a contemplation that an attorney is going to be involved in the investigation and is going to be a meaningful participation. It's just not going to be somebody who happens to just – But his signature at the end, doesn't he represent that? I guess I'm just trying to figure out why he couldn't have signed off on it because he's representing that. I don't know what he's representing because he's not – it's not his form because it has Jessner's name on it. And so it is her – her name is on it, and then it says under penalty of perjury at the end, and it's still got her name on it, but then he's signing it. And so there's – there's a ruse going on here because he doesn't know anything about the investigation. He's just walking it through because she's not available. That's the problem. Well, but I guess it would be problematic if we – It's different. If, for example, we went into chambers with Judge King, they had a court reporter reporting the presentation where the AUSA was making representations to the court at that point saying, yes, I'm up to speed on this case, and so I can make the same affirmance that Ms. Jessner made because she has told me about the investigation, and so now I understand the investigation. Or maybe – yes, ma'am. Okay. 2516 says that any attorney may authorize the application. Okay. We've got an attorney here, don't we? We have the Assistant Attorney General of the United States saying this is authorized. He – they address his role in 2516-1 where it talks about, you know, who are the – and this list of people has expanded. Why is he the only assistant? Well, because any attorney is defined under federal rule of criminal procedure section 1, and it includes an Assistant U.S. Attorney. It doesn't include the Assistant Attorney General of the United States? Well, of course it would, but he's not making the application. Well, it says any attorney for the government may authorize an application. I see. So I'm not sure that that's a defect. We have an attorney authorizing the application. We have the investigating officer providing the particulars. I'm not sure that we have this great technical defect. I think it depends on how you look at the role of the application itself, because the application is part of the process. You've got – it's not just like a search warrant where you have the affidavit and support thereof and that's it. You've got a number of other groups that you have to jump through. You have to get the authorization from the Attorney General, as you've mentioned, but I don't think that the any attorney refers to that because – That's just one piece of it. Is that authorization? I'm sorry. That's just one – I'm sorry. That's just one piece of it. Having – is there a transcript of the proceeding that's under seal or elsewhere on the authorization of this? I've ordered the original district court records, and I don't have them yet, so I don't know if there's any such thing. I'm not aware of it, Your Honor. I've never seen it. I don't believe – if you're talking about a transcript that supplemented the application process before the court, I don't believe there is one. But I want to get back to Your Honor's question because you're saying that, look, the Attorney General signed it. He's the attorney. What's the problem? It's a problem for the fact that you have the investigating DEA agent providing all the particulars. So that goes up. I take it to the Attorney General, Assistant Attorney General. He sees that application. He approves it. Then the normal courts, I guess, it goes back to the AUSA. The AUSA does the summarizing stuff, the one who's involved, and signs it, and it goes up. It's not really the summarizing stuff, though, see, because the person that really has the horsepower to do this application is the person involved in the investigation. I know, but that is the normal thing. But if your argument is that there's a technical violation, then I'm not sure we have a technical violation. And so the question then, you know, if we don't have a technical violation, then the question is, okay, there's no technical violation, but is there something substantively wrong here? And, you know, is there something squirrelly going on here with the AUSAs? You know, I guess we don't know that. We don't know that, and that's part of the requirement. This is what I'm saying, is that you can't just rely on the Attorney General's memorandum and the affidavit of the agent. And I'm not sure the statute says that. Because you're saying you have to have an attorney involved in the process, and there is an attorney involved in the process, the one who authorizes the application. To me, authorizing application and signing application is two different things. Okay. Wait a second. Can you just tell me this particular code section that you cited earlier that you think is violated? 2516 Forens 3. Okay. Because we should move on. Yes. I'm running out of time. There's a number of other problems with this case, as Judge Snyder noted as well. So let's move on to the next one. Okay. I do want to reserve a little bit of time, but I want to jump into a couple of these other points very quickly. There are a lot of issues in this case. The reckless misstatements and omissions in the Title III affidavit. This is really a bare-bones affidavit. There's not a lot of probable cause in here. The most important thing, I think, to take away from what we've argued is that Judge Snyder said that under 2518.3, one of the requirements is that the individual who is the focus of the wiretap application, which in this instance was Eddie Smith, has to be shown to be the one using the telephone. And as it turns out, the only evidence of that were the two ruse calls that were made by the Long Beach Police Department officers. We know now that they outright lied about one of the ruse calls. It never happened. And they concede that at the motions hearing. The other one is an impossibility because they know that Mr. Smith was on Target 1, according to cell site information, in another location. So he couldn't have been on Target 2. That was a reckless omission, and so there was a substantial showing at that point that the government had failed to show a nexus between Smith and Target 2 in order to justify the issuance of the warrant. There's a lot of other statements that are made that are already in the brief, so I'll rely upon those. I see I have about four minutes left. I'm going to give you more time because this is a seven-week case, and it's got a number of very serious issues. Why don't we move to the warrantless search of the Cedar Avenue apartment? Okay. Well, with regard to that, the Long Beach police officers were surveilling the apartment for some time because they had put two and two together based on this intercepting call that my client was living at the Cedar. Once they started to hear on the wiretap some suggestion that a computer had to be moved out and whatever, they claimed that they had exigent circumstances because there was this imminent destruction of governance that was about to occur, but they don't move in. They don't do anything to exercise their rights as law enforcement officers to go in and secure the premises. They wait an hour. And so the argument there is that because they don't do anything for a whole hour, and this is not Guam. Like one of the cases we talked about where they say a magistrate's on duty in Guam from 9 to 5. This is L.A. A magistrate's on duty 24-7. They could have gotten that telephonic warrant right away, but they didn't do it. And so we're arguing that the observations that were made while they went in there in a warrantless sense should have been suppressed. The testimony about my client standing naked in the kitchenette, the testimony about his girlfriend standing over the handgun that was sitting on a towel. This was all presented to the jury. It's prejudicial for them to hear this evidence. This was not – this takes away from this argument about independent source where they say, well, we eventually got the warrant, and we didn't rely upon their observations to get the warrant from the state judge, and yet they did present evidence at trial about things that they saw before they got the warrant. So there's a problem. You're saying that they should have gotten a warrant. They should have started to work on getting that warrant, which they eventually got by telephone. They got a telephonic warrant, but they didn't do it. But it took them an hour. The court found that it took them about an hour. The entry was at about 3 o'clock in the afternoon, and the warrant says that it was approved around 4-30 or later than that. Hold on. I want to back up just a little bit. They didn't get a warrant. They did under exigent circumstances. You say they should have gotten a warrant. Okay. But then I think it was in your reply brief, though. You offer observation that when the investigators tried to get a search warrant after entering to ensure no evidence would be destroyed in the interim, it took them two and a half hours to get a warrant. I don't recall saying specifically how long it took, but it did take them. So doesn't that undercut your argument that they should have gotten a warrant when they realized that they couldn't get a warrant quickly? Well, I don't know why it took them so long to get it. Because when you look at that warrant, it looks like it could have been put together in about five minutes. But I don't think it undercuts my argument because I'm saying that some of the evidence that was presented in the trial was observed during the warrantless entry period. When there was a seizure of the apartment and everybody was sitting around. Okay, but that's a different argument. I mean, was there an objection to that evidence? Yes. There was an objection to all of that. There was a motion to suppress any hearing. The trial attorneys were very thorough in making sure that they objected to everything. To that specific evidence. Yes. Absolutely. And then when you look at the warrant itself, besides the fact that they talk about the interception from the wrong phone, the wrong facility, target one, there's this embellishment about what is said in the conversation. Let's just go back a second. Your problem is the evidence they saw when they entered under exigent circumstances, in their view. And you think there were no exigent circumstances? There wasn't any real evidence that evidence might be destroyed? Well, it wasn't clear that evidence would be destroyed. Well, it's not clear, and the district court makes a factual finding that the officers had a reasonable reason to think evidence was destroyed. Aren't we stuck with that factual finding? Not if you look at the actions, if you consider the actions taken by the officers, because I think that that helps define whether or not there were exigent circumstances. If they don't move to secure the premises, then they don't necessarily think that there are exigent circumstances. The one case at Bayside is the Linda case. When they entered, they didn't take steps to secure the premises? Obviously they did, but that was an hour after they knew that they had to move in. Okay, but they've got to get themselves organized. I mean, your argument is that they thought there were exigent circumstances, but they didn't move fast enough. But if they haven't told everybody they're coming, you know, that gives them a little bit of time to get themselves organized, doesn't it? If they haven't told their fellow officers that they're coming? The people in the apartment. Oh, the suspect, okay. Well, actually, there were some conversations intercepted between Mr. Fouts and another party about Fouts being chirped by the officers. And it appears to me from reading that conversation that the officers were actually communicating with him in that manner before they even went in. I don't know what that means. Well, he has this push-to-talk telephone with a chirp feature on it, so you can make some sort of a noise or you can convey a message through the phone that shows that you're there or that you're aware of the existence of the facility. And he talks about chirping. But to me, that's sort of besides the point. What I look to is the fact that they did wait that whole hour before they went in, and then they rely on the Lindsey case, which was a case where there was bombs, there were also drugs, and there was also the case out of Fullerton, and there was also the sale of cocaine on contingency where the seller was waiting for the buyer to come back with the buy money. And so the officers were very anxious about going in, but they were waiting for enough backup in order to do so. And there was an hour that went by before they actually entered the premises. This court said that was okay because they had a reason for their delay, and the delay was to get enough manpower to actually go in. But that's not the situation here. Can I ask a practical question? There were several counts of conviction, and do they all have to go to make a difference for Mr. Fowkes? Well, when you talk about make a difference, I guess at this point we're really fighting for expungement of the conviction. But if we don't get doubt, if the most serious count, which is count five, gets dismissed because of the body cavity search issue, which we have another chance to talk about, then it would appear that on remand for resentencing, the court would reconsider the length of the supervised release term. Okay. The court's probably going to have to do that anyway. Okay. I'm happy to talk about it. I think let's talk about the body cavity search issue. Okay. Well, our position is that the way they did it was, to quote the Rochin decision of the Supreme Court, extreme and patently abusive. I guess the big argument is, was this a body cavity search or was it something else? Because part of the evidence, I guess, was still protruding from the body cavity, the rectum, so to speak. And yet, if you recall the testimony of Officer Harris in the second trial, he described what was seen during the search as a very small opening in the orifice that was about dime-sized. And then when you go back and look at the evidence itself, and there's actually a little ruler that is superimposed on the page with the drug evidence, that the five-plus grams of cocaine base at its greatest length is almost five inches. Which means he had to put his hand up, Mr. Faulk's rectum, five inches. Yeah. It means that he, yeah, he shook his hand to shove the evidence into his cavity. The district court credited, I mean, I think we have to look at what the district court thought, and the district court, because I want to make sure I understand this, the district court in its order, and I think during the hearing, credited the officer's testimony. And the officer's testimony was that he pulled from what was protruding out and didn't intrude, or there's nowhere in there that says he did intrude. I know that was disputed below, but the district court ended up making a factual finding. And how do we not defer to that factual finding? Well, I think you can defer to it in terms of saying, yeah, well, he actually didn't reach in by probing with his fingers, with this gloved hand of his, that rather he pulled the object from my client. However, you still have to deal with the way he did it and the end result. I mean, you know from the record what the evidence looked like after it was extracted. And you know that there was an injury that was sustained on the part of my client. Either when he did this to himself or by the, you don't know what caused the blood. Oh, okay. Well, that's fine. I mean, that's on the record. Okay, okay. Maybe he's guilty of causing the harm to himself to some extent, but the fact of the matter is that the police joined in when they decided not to call medical personnel. This is a civil rights suit, so we're not concerned in that sense about who caused what. I think the question is constitutionally what has to be done. To me, I don't see the purpose of a search warrant. If the search warrant is to show a magistrate you have probable cause to search, we know from Florence that you can look, and we know that what you're looking for is contraband. So now we've seen contraband according to the factual finding. My question is what should govern the manner in which this is done? Is this an unreasonable seizure or is it a reasonable seizure? And what would make it a reasonable seizure and what makes it an unreasonable seizure? I mean, I may be looking at this wrong, but that's how it seems to me. Well, the question is really whether it was a violation of the Fourth Amendment. And so you have to go into that balancing analysis about the manner. And in this case, he was tasered to make him limp, which is more akin to a medical procedure than the taser part. So the manner is part of the factor. I don't know what Long Beach police thought they were doing by tasering him at this point. Five officers, they're not just in the intake cell, they're in the strip search cell. Five officers. I guess at that point from the evidence, from the testimony of the police officers, he was not handcuffed. But they see this plastic. And according to Officer Harris, which the district court correctly credited, he just saw, like, a little piece of a dime-sized kind of thing. At that point, the question isn't whether or not they necessarily need to get a warrant. It's whether what they did violated the Fourth Amendment. And we have several cases on that that talk about the way, the intrusiveness of the search, the manner in which it was conducted versus the need for that particular search. And there's one last factor. What bothers me about this is that they tasered him. So why did they have to taser him? And then there's testimony by the officers, credited by the district court, that he was limp. And so they put him up against the wall and re-handcuffed him. And that is when, I guess it was Harris reached in and, no, Gibbs reached in. And the district court says that the court finds Sergeant Gibbs' representation that he saw the bag protruding from the defendant's anus to be credible. Therefore, it's okay. But she didn't conduct the appropriate Fourth Amendment analysis, which we have cases written 20 years ago that say what it is in the context of a body cavity search. Right. And so there's also a pinnacle section that is incorporated into the Long Beach search policy under 4030K, which tells you that, or suggests, strongly suggests, that in these instances you should really get some sort of trained medical personnel to do it. Okay. This is what concerns me. I'm concerned about whether the search or the seizure is reasonable or not. I understand they tasered him at the beginning of this because he was not cooperating with the directions that they were giving him in connection with the search. And that's when the tasering happened, the so-called dry tasering. No, dry stun, dry stun tasering. Okay. So what I want to know from you is what is reasonable under the Fourth Amendment in these circumstances? What is reasonable to do if you see the bag protruding, if you assume you can see that there's some cocaine, what is reasonable? Suspected cocaine, yes. I think what's reasonable is that you follow penal code 4030K, Long Beach's own policy, and you isolate the individual, you continue to observe him. If you don't think the warrant is required, per se, you still do it in a humane and civilized way, which is to get somebody who is trained. The people that are listed in 4030K. And is that what 4030K says, is to get? Yeah, it defines a list of persons who are either physicians or nurses who are qualified to do these types of extractions because it's not like Schmerber where the guy was arrested, he was under the influence of alcohol, and alcohol dissipates in the blood and they had to take the blood right away, but they still did it with a physician. I understand that. Let me ask you a question. So is violating 430K per se an unreasonable seizure? I would say what they did violated the constitutional discussion that's contained in Schmerber and Roken and also Winston v. Lee, which is this other U.S. Supreme Court case which talked about the extraction of a bullet. Because? Because it's dangerous to pull an object of that size out of somebody because you can really harm them. That's the position that we're taking. Am I correct that the district court didn't analyze that aspect of this? It seems like her opinion ends rather abruptly there. She just says I find Gibbs' version of the story credible, period. Yeah, it was funny because the court was very, very good in its orders in going through everything, but at the very end, I think, is when she started to talk about the body cavity issue and she gave it very short shrift and there wasn't a very good development of the law and how it should have been applied to what was done in the jail. And keep in mind also that he wasn't going into the general population. Also, when you talk about the intrusiveness of the search and weighing the Fourth Amendment issues, typically don't they just put him in a holding cell where it's going to come out sooner or later? Exactly. That is a standard thing that they do, right? That's what they do. Or should do. Yeah. Do we know anything about whether there is medical harm to leaving in this lower part of the intestinal tract? I mean, I understand things can break in the other parts of the intestinal tract and kill people. Is there anything about that? There's nothing in the record. So if that were a factor to be considered, it's not in this record? That's correct. That's correct. Well, the police didn't testify. That was the reason that they did this. No. We know that from reading all of their testimony. All right. I'd like to – Can I just – one more thing on this one. If – so this was – was this the 2.6 ounces of cocaine? No. Okay. Which count is this related to? This is the – I think it's count five, I believe. This is the largest. This is the largest. And this is the one where – well, there's still the mistrial and there's still the discovery issues to argue if there's time. But this is the one that was weighed on three different occasions and there were three different results. And there was also a qualitative result that was rendered for this particular exhibit. So this is the one – the reason why at the – this was before the Fair Sentencing Act. The reason why it was such a bone of contention is because it triggered a mandatory minimum of five and then there was the enhancement that was later withdrawn under 851, which made him looking – he was then looking at 10 years. And so it was a big deal, that particular count, of course, after the Fair Sentencing Act it became less of an issue in terms of the guidelines. But I thought the district judge here, although it was before she knew it had to be retroactive, applied it, right? She did. Yes, she did. She did everything right. Because she knew what the law was and she chose. She said, I'm going to apply it retroactively. She gave him the benefit of the doubt in every sense. The only issue he raised on that was the supervised release issue because when you look at 841, it talks about mandatory minimums. And so after the conversion to 28 to 1 and he was no longer a five-year minimum mandatory candidate, he was looking at a minimum of three, I believe. There's nothing in 841 that talks about his qualifying for a lifetime term of supervised release. She didn't give him that. No, but she gave him eight. And if you look at 3583, it should have been five if 3583 trumps the statute when the statute is silent. But, you know, originally the eight came from the PSR, which was done under the earlier act. But by this time, the judge has made every indication she knows the law is different. That's right. That's right. So with the exception of the supervised release issue, the judge gave Mr. Faust all the benefits of every interpretation of law in terms of its retroactivity and all of that. If you eliminate count five, though, if we were to reverse count five based on the CAVI search, what's the consequence? It would go back to the court, I think, for resentencing so that she could determine whether the eight-year term is still justified because that count is no longer one of the counts of conviction. I think it would just go into her analysis of what is reasonable for being convicted of the little rock, the .6 that was found on the street during the fight between the officer and Mr. Lee, I believe, and then the 2.6 that were found in the apartment. Now, there's plenty of other issues. I don't know where we're going here, but the mistrial, I still think, is a big problem in this case. The lower court did not think it was such a big deal because it didn't appear to her that the government was seeking to goad the defense into a mistrial. She made a finding on that. She said that there was no evidence that the government intended. Obviously, there's not any direct evidence, but she didn't find any circumstantial evidence that that was their intent. Well, she didn't find any direct evidence, but the circumstantial evidence was certainly present, and that is you're trying a case, you know that a defense witness is going to be testifying, you know that that person has a warrant, and so you're planning to arrest that person after she testifies. And yet the case agent is the one that is tasked with dealing with the marshals on that issue instead of the prosecutors. They sort of sit back and let those parties deal with it. And then the case agent says, I couldn't really tell the marshal what to do. I could only make a recommendation. And then the marshal testifies that he doesn't even recall the agent telling him anything in terms of how to orchestrate the arrest. And so with all of that in mind, circumstantially it seems like by not taking the proactive steps that were really necessary in order to avoid the situation which unfolded, you've got a serious problem here because of the negligence of the prosecution team. So it has to be intentional, doesn't it? You didn't make those findings?  It was egregious, egregious behavior. And I think Judge Schneider was very angry because she felt at that point she had no choice but to declare a mistrial because you couldn't go forward with that jury having heard the arrest and the screaming outside the hall with that jury, and there was just no choice but to declare a mistrial. That's right, because she found that there was manifest necessity to do it. The defendant, he wanted to continue with that jury. Remember, it was a good jury for him. The court observed that there were three African Americans on that jury, and normally a defendant should have the right to be tried in one proceeding. I mean, that's how all of these cases begin in their discussion. And he lost control of his ability to really decide what was going to happen. Didn't his own lawyer make the motion for a mistrial? Yeah, his lawyer made the motion for the mistrial, but Oregon v. Kennedy says it doesn't matter if you can show... No intent, right. Right, and so this court may decide that there wasn't sufficient intent. We're going to decide that there's not sufficient intent based on what is before us, even though the district court, who was right there, was able to observe and evaluate and decide that there wasn't? That court was in a better position to obviously evaluate that, I concede, but when I look at the evolution of events, it's very disturbing because it's like if we don't do anything, something may happen that will benefit us. Can I ask you something? Were you in Roybal or was it in the Spring Street Courthouse? It was the Spring Street Courthouse, so you've got the wooden doors with the glass panes on them. So there's plenty of room for them to walk away, for her to be further away at the time of the arrest without being outside the courthouse. That's right, because you go down the hall and then you get to the escalators and the elevator bed. There's plenty of places to do it where her movements could have been controlled. It didn't have to be right outside. And there's no question that the jury saw it, and the judge herself said that she saw it. And if some of the jurors didn't see it, they certainly heard it because she was wailing. Okay. You've really gone way, way, way, way, way over. So is there any last issue that you haven't touched on? Well, I just want to touch upon the discovery issue on the largest piece of drug evidence, because that was the one where the defense had requested a chain of custody discovery before the second trial, and there was no forthcoming discovery. Initially, the court took the position that since it was a state agency, the federal government didn't have the responsibility to provide that discovery to the defense. But then when it was – but the cases interpret it differently. They say, if you're a state agency and you're part of the arm of the prosecution under Kyles v. Whitley and under Stever and then under that recent decision decided in this court, Butziak, then that discovery, if it's material, should be turned over, and the government is responsible for doing it. What they did here was they gave it to the defense in mid-trial, after there had been extensive cross-examination of the government's witnesses who were in the chain or who were testifying about that. And in particular, there was this computer printout that was generated in the Oracle system for Long Beach Police Department, which shows nothing as to what happened – what first – where the evidence first went. There was a contradiction between the officers as to whether they went into the narcotics office or into the property division. The computer only accounts for it the next day. And then there's a series of entries in this computer printout where, at the very end, it indicates that it's been checked out to the district attorney. There's no indication that it's actually been received by the DEA agent who was sending it on to the laboratory in Vista, California for federal amounts for what became the analysis for trial. And the DEA-7 that was presented as part of it. So there's a lot of issues concerning the integrity of this evidence and whether, in fact, this was really what was seized from Mr. Fox at Long Beach Jail. Okay. So the judge had a remedy, and the remedy – you can do discovery now. But I think your problem doesn't sound like it's really about discovery. Your problem seems to be that, okay, well, now the trial is unfair because you're making us look like fools. Because I didn't really see where it's now a discovery problem. I see it's now a problem that you think you have an unfair trial. Okay. The reason why it's a problem is because the Long Beach Police Department defied the order of the district court. The discovery comes in mid-trial. The defense says, I will be ineffective if I don't ask for a continuance. The court grants the continuance. And then there is no – nothing is done. No, they make attempts to do a lot. They go down there to Long Beach, and they go to the head technician custodian to try to get access to the hard drive. And they're supposed to be given the right to conduct a preliminary analysis of the database used by the property department. Okay. But if they're having – if they feel that they're not getting cooperation with what the district court has said has happened, isn't the remedy to go back to the district court? I mean, how can we decide what's going on here? Yeah. And that didn't happen, right? Well, it didn't happen, and the court was getting anxious because the jury was being – was sitting in limbo for all this time and at some point had to just say, okay, enough is enough. You're not going to make any progress. I think that you, you know, you could reopen, and you could use whatever you've gotten so far to try to create doubt concerning the chain of custody. But then it turns out after the conviction and under the – during the Rule 2933 phase and then after that, when my client is now representing himself, that the court is still – I mean, if the court had thought at that point that the matter was resolved and the opportunity was given and there was no – there was no error, there was no prejudice, then why is the court then issuing orders after the fact, post-conviction, saying, okay, you've got your expert. Now, go down there and find out if there are some irregularities. The reason why the court's doing that is because the court is starting to wonder herself if there's a problem. And so they've got an expert who's going down there, and he's getting stonewalled. And they're saying, look, we'll get all this report, but we're not going to give you access to our database. This is not going to happen. You're not going to sit there and look at our hard drive. And everything that was discussed in the Buziak case, in that child pornography case, where the FBI had this software, this proprietary software, that they were not going to give the defense access to. It's very, very similar to what happened here. And in that case, they said that that was wrong because the point is, is that you didn't have to prove that you would prevail if you found something. The only thing that was important was that it would be material to the development of a possible defense. The development. That's pretty broad. And the failure to produce it was prejudicial. Right. Okay. This is sort of not in the record. I'm just curious. Have there been any violations of any of the conditions of supervised release or alleged violations of any of the conditions of supervised release? You mean since the time of the commission? Since the time of the commission. I haven't represented it on those things. So you don't know? I have an inkling that there have been some problems, but I think they've been dealt with. And I know that I've had some talks with the gentleman, and I know he's back in school now and he's really trying to turn his life around. I know that. Okay. All right. You've gone almost half an hour. All right. Well, thank you very much. Thank you. Good morning. May it please the Court. Cheryl O'Connor on behalf of the United States. Okay. So that's the question. Were you involved in this trial? Were you the trial attorney on this? No, Your Honor. My only involvement in this case came following the briefing to cover the argument. Oh, following the briefing. So I wasn't even involved in the briefing on the case. I can say, however, AUSA Rosenberg is present. He has another matter before this very panel, which is why I'm appearing on this one. So Mr. Rosenberg is here. If we could start with the wiretap issue. Your Honor, Judge Woodwell was concerned about the signature on it, and I just want to say I'm not sure if it's a photocopying problem. I'm getting the original. Okay. Because it does appear to me that it indicates Kevin Rosenberg for Samantha Phillips Jessima. All right. On the actual signature of that. I want to address Mr. Schlesinger's claim that 2516.3 requires that an attorney, rather than a law enforcement officer, make the application. And the government respectfully disagrees with that. I think the court was correct in pointing out 2516.3 states that an attorney may authorize the application. But 2518.1a indicates that the application may be made by an investigative or law enforcement officer. And as that term is defined in the regulatory scheme, that can be either an attorney authorized to prosecute the offenses or a law enforcement officer who is authorized to investigate the offenses. Right. Okay. So here's my catch-22 on that. Okay. If it is made, if it's, I think that's probably correct. So let's, if we look at the Kepner, is that the officer? I believe it's Special Agent Koppen. Koppen. Koppen. Okay. We look at his and we say, okay, this is going to be the application. He's missing the authorization. His affidavit is missing the authorization by the Department of Justice representative. That authorization is attached to Ms. Phillips' application. And it's not attached to the law enforcement agent. So if he's making it, it's defective on that ground. Who's Ms. Phillips? I'm sorry. Desner, I'm sorry. Oh, okay. But let me finish the question, okay? Because if he's making it, I think it's sufficient on the ground that it doesn't have the DOJ application. If she's making it, it seems to me there's no, we don't have any precedent on whether or not it was appropriate for Mr. Rosenberg to sign for Ms. Desner, right? That's correct. As far as I can tell, there's no prior authority. So then I gather, then I guess we have to maybe go to the cases to see whether this goes to the heart of the wiretap authorization or whether this was a technical error. Because if you put everything together, also the question of is it legal for Mr. Rosenberg to have signed on behalf of Ms. Desner? Okay. A number of responses, if I may, Your Honor. First of all, the wiretap application comes together as a package. So altogether you have the document prepared by Ms. Desner, the Attorney General's authorization, and Special Agent Kopin's application together such that Special Agent Kopin's oath or affirmation is sufficient to preserve the entire application. With respect to whether there is a technical, if the court finds that it was improper for Special Agent, excuse me, for AUSA Rosenberg to sign on behalf of Ms. Desner, it's still simply a technical violation. Because the cases look at whether the violation goes to the overall supervisory process. And here it's clear that there was, that the Department of Justice through AUSA Rosenberg and or Phillips-Desner and through the Attorney General's review process was authorizing this. In their reply- But the question I have is Rosenberg doesn't seem to have any personal knowledge of the things that are in the application that Ms. Desner prepared. Well, the record is we have it as silent on that. Because it's not clear that it could very well have been the case that Special Agent, I'm sorry, I keep calling him Special Agent Rosenberg, that AUSA Rosenberg had a conversation with Ms. Desner or had a conversation with the case agent or did something else to educate himself about the facts contained therein. And it has been my practice during the time that I was in Narcotics AUSA, the different district courts conduct themselves, the proceedings differently. So some judges do have a reporter, a court reporter there. And so there may very well be a sealed transcript. I'm just not aware- We're looking for it. Of whether there is or not. So that may address the issue. But in any event- If there's not a court reporter transcript, what do we do? Well, then the record is just silent on whether AUSA Rosenberg had sufficient knowledge to swear to the application. But that- But if the record is silent, there should be something given to the district court to adequately assure the district court that Mr. Rosenberg can attest to the things that Ms. Desner wrote that she attested to under penalty of perjury. There should be something in the record. I don't know which way the fact that there's nothing in the record goes, if there's nothing in the record. Well, if there's nothing in the record, I think it would- I don't think that it would undermine the government's position that this was merely a technical violation. Because if there were some indication- If the record were silent, and yet the fact that they played out were that AUSA Rosenberg signed this document and the district court thought that that was inappropriate, the district court wouldn't have authorized the wiretap. The fact that the district court reviewed the application, and plainly one can see that it's signed by a different AUSA, supports the notion that the district court felt that the application met the requirements of the regulatory scheme. I don't think the district court could be wrong about that. Well, that is true, Your Honor. And it's- I think it was trying to address the issue of how the silence in the record. So, AUSA Rosenberg signed, saying- did he then sign under oath, saying all this was true by his signature on that? Again, it's unclear exactly what AUSA Rosenberg's signature thereon means. It could mean that he's affirming- he's taking the oath himself, and he simply hasn't gone back and changed the paperwork. Or it could mean that he's had a conversation with AUSA Jessner, who is unavailable for some reason, and she has said, go ahead and sign for me on that document, which is not an uncommon practice for one attorney to sign on behalf of another attorney, even defense counsel for a prosecutor and vice versa, so long as you have proper authorization to do so. But in any event, let's just assume for the moment that it was improper for AUSA Rosenberg to sign that. We still think that the district court, meaning Judge Snyder, was correct when she evaluated this and came to the conclusion that under the regulatory scheme, Special Agent Kopins' oath and affirmation were sufficient to make the application compliant. And even if this court disagrees with her finding on that matter, it's still simply a technical violation for which suppression wouldn't be the remedy. I think that's a key question, given the silence of the record. And the scheme provides for limited bases for suppression, Your Honor. Communication is unlawfully intercepted. The order or approval is insufficient on its face, or the interception is not made in conformity with the order. And this particular violation doesn't rise to the level of either of those three categories. Now, Mr. Schlesinger referred to the Giordano case as supporting his position, but the government believes that the interplay between the Giordano case and the Chavez case supports the government's position here. The problem in Giordano was that the Attorney General's executive assistant had signed the authorization and that that person was not authorized to give the approval. Whereas in Chavez, they simply incorrectly identified the official who signed the authorization, which I would argue is similar here to having Rosenberg sign instead of Jessner. So all the parties who were properly authorized did, in fact, give their approval and were, in fact, supervising the investigation of this case. There's no evidence in the record that this was any type of ruse on behalf of the government or the U.S. Attorney's Office in order to fool the district court. So just to interplay, so how are the Long Beach, how is the Long Beach Police Department interacting with the prosecutors in this case? And were they acting with any other federal agents? Well, my understanding of this case and the way that a case like this would typically work in our office is that the case agent is a drug enforcement administrative agent. But the DEA is working in connection with the locals who have the authority in this area, particularly in this case, which was part of a larger investigation into gang activity in the Long Beach area. The local officers were providing support, but the AUSA's main contact is usually, not always, but usually. I thought that there was actually something stricken, that there was no affiliation with the gang in this case. There was a mention in the PSR that there was an objection, and Judge Schneider struck that. I don't think that Judge Schneider made any findings. Certainly, at sentencing, the defendant represented that he was not a member of the gang. So I don't think you should bring that up. That's not appropriate to bring in, this is how we do gang-affiliated narcotics investigations. My apologies, Your Honor. That certainly wasn't my intent. Okay. And I'm not suggesting that Mr. Foulkes is a member of the gang. I'm simply saying that that was the background of the investigation. Okay, but why bring it up? It's irrelevant to this. I mean, I think you're on the right track with your suppression argument. Thank you, Your Honor, and my apologies. That certainly wasn't my intent. Should I move on to one of the other issues, if the Court doesn't have any further questions on the wiretap for me? Yeah, I guess I just have one question about, you know, I've seen a number of cases involving the Long Beach Police Department, and they're not pretty, most of them. And I do have a question about why they just, they, you know, organized themselves and didn't, if they had a sincere, real concern that right now evidence is being destroyed or drugs are being flushed down the toilet or whatever, why they waited an hour to go knock at the door and ask to be let in. I mean, I don't understand that. Or why didn't they, if they had that hour, why didn't they, I know how magistrates are on call. Why didn't they just call the magistrate? They didn't, I don't even really think they needed it. They may, I mean, there's exigent, if there's exigent circumstances, they don't need to call the magistrate. But why an hour before, if they thought the evidence is being destroyed right now? Well, if I could address that in two ways, Your Honor. First of all, with respect to why they waited an hour to enter into the apartment, there was testimony before the district court that it was an hour from the time they first, they intercepted the first call. So, first they have to understand what the call means, you know, make the decision that they do believe it is exigent circumstances that they are going to go in. And then they said they had to have a briefing for officer safety purposes before they simply entered the apartment, and that it took an hour to gather the officers, have the briefing, and then make their entry. And in the scope of those things, an hour does not seem an unreasonable amount of time to do that. Couldn't you destroy a lot of evidence in an hour? Well, certainly, you may have. And I think that the testimony was that the officers were working with due diligence to make their entry. But they also have to be concerned about officer safety issues. And as it turns out, there was a loaded firearm in the apartment. So, any concern in that regard was well-founded. But I also want to clarify the record that it was not that they waited until they did their, they waited an hour, then they entered, then they tried to reach the magistrate. At the excerpts of record 2158 to 59, and again 2164, the officer, I believe it's pronounced Sue, T-H-U-E, and Special Agent Copin both testified that they simultaneously, they peeled off and worked together to prepare the affidavit and to locate a state judge to sign it on the Labor Day weekend, while the other agents moved to prepare themselves and then make entry to secure the premises. So, I want to be clear, because particularly in the reply brief, the defense makes the assertion that they were not working on those two simultaneous tracks. And the record indicates that they were. And still, even though officers had started to prepare the warrant, it still wasn't complete within the hour. So, they couldn't have, they couldn't have reduced that amount of time. And that demonstrates that they weren't able to simply get a telephonic warrant before moving in. If I could address what has been characterized as the body cavity search, there was some concern about the district court's findings. And although there is a, the issue presented in the district court was whether it was a body cavity search or a strip search. And so, even though the paragraph of the order with the subheading body cavity is somewhat brief, on the pages before that, the court does do the Fourth Amendment analysis of whether the search was reasonable. And it's pages 106 to 109 of the excerpt of records. So, first the court considered, first the district court considered the question of, was this a body cavity search or was it a strip search? And she concluded that it was a strip search and that, that it was done reasonably. And so, for that reason, she goes on to make some summary findings regarding the body cavity search. And that's where her credibility findings regarding search get disbarred. This is where I get confused about it. I mean, it seems to me it's perfectly fine to search. You're searching for something and there it is. And then, what is it reasonable to do under the Constitution? And that's where I don't know the answer right this moment. So, maybe you can tell me what's reasonable. I mean, I could think of a lot of objects that they might be protruding and you would not want to do anything because you would cause massive damage, you know. And who gets to decide what to do and when to do it? And what's practical? What's reasonable? How does the balance work out? I don't understand this. Well, Your Honor, I think, again, it has to be analyzed under a totality of circumstances. And you have to give some deference to the officers who are there at the time trying to make the decision. They have been following their police department's protocol, which defines how you conduct a strip search versus how you conduct a body cavity search. And a body cavity search would involve actual violation of the physical body or actual intrusion into the body, which the district court, I would call this indirect intrusion, right? You're putting force upon something that then affects the body cavity, right? So, it's indirect intrusion. It doesn't really fit in any of the cases I've seen. This looks different to me. I like the case that was decided for Curiam about the pubic hair search. It's more valid because it's easy. Then Judge Kennedy was on that panel, and he found that it was unreasonable to go. It's a Ninth Circuit presidential decision, but it was unreasonable. They needed pubic hair for DNA for a rape suspect, and so they went and took one of the defendant's pubic hairs, and they held that that was unconstitutional because it was without a warrant, and it was an intrusion into his body. Well, I suppose there would be a number of differences here. First is the fact that they're in the booking process already. Before we go there, though, I think you made a misstatement. The analysis about the Constitution that the district court went into citing one of the cases that I was on was as to the strip search, which he characterized as strip search, and I agree with everybody here that police certainly have a right to conduct a strip search and a visual cavity search before putting an inmate into the general population of a prison. But her analysis as to whether or not there was a body cavity search is lacking. She does not discuss the Constitution there at all. Well, that's true, Your Honor, and I didn't mean to make a misrepresentation. My point was simply that she does the – she makes a – she addresses the threshold question, which we believe is the question here. Is it a body cavity search or is it a strip search, the search overall, including the removal of the item from the defendant? So she made – you're saying she made a finding that there was not a body cavity search. That's correct. Okay. And we believe that that – So our – the question for me, then, is whether that was clearly erroneous, crediting all of the testimony of the police officers. Right, and I would submit, Your Honor, that it wasn't clearly erroneous. I know you wouldn't – I am having serious doubts about it because of the nature of what they did and the blood and the feces on the gloves that the officer at Harris – that Officer Harris testified to. I mean, if you read all of their testimony together, which I have, I don't know how you could find that this was not a body cavity search. Well, again, because under the case law, the body cavity searches tend to look at whether there was an intrusion of the body. Right. And – or I suppose with the case of the pubic hair, whether there was a removal of part of the person's body. And here that wasn't – Well, it's touching the body. I mean, I don't have the cases in front of me for some reason. I can't find them right now in this huge bench book. But, I mean, it's touching the body, affecting the internal part of the body. And Justice Kennedy had some very eloquent language on that, I think, in the Cameron case, of why that is such an intrusion and highly humiliating and contrary to the dignity with which we should treat inmates. And especially here when they could have just, you know, put them in a holding cell and it could have come out naturally. Well, we're not – I don't think that the record establishes that that would have – that that is what would have happened had they just – That is what happened. But as another member of the panel raised, Your Honor, Judge Rustani, we don't know whether further harm could have been done to the defendant during that time. The police – the officer's testimony – nowhere do they say, we did this because we were afraid of further harm. Nowhere do they say that they tasered him because they were afraid of violence. They tasered him to make him limp so that they could go in and take this. Well, I believe the officers felt that they had an obligation to try to preserve the evidence in this case and that they were authorized to conduct this search to prevent the defendant from destroying the evidence in this case, which he was clearly attempting to do. I thought he was attempting to hide it. Yeah. They say, do this, we want to examine you or look at you, and he starts to push this further into his rectum. And isn't that when they taser him? Yes. He's not trying to destroy it. He's trying to hide it, and he just doesn't succeed. Very well, Your Honor. I think you're right. I'll concede that. He was trying to hide it. But he wasn't going to be successful at hiding that for long in a prison. Well, Your Honor, and in retrospect, there are certainly – in many aspects of this case, there are things that should have and could have been handled better. And that's an understatement. But despite that – But we're talking about, you know, someone's life and liberty here. I mean, it's – Despite that, I'd like to hear what your theory is in response to Judge Rossani's question of what is it, what makes this reasonable, or is there some issue we should be focused on and why it wasn't unreasonable. So can you please – I can certainly attempt, Your Honor. What makes it reasonable is simply the totality of the circumstances, that they had a lawful arrest of this defendant. They were attempting to follow their strict search policy that was promulgated by their department. The defendant was not compliant. He was disobeying their orders. He was attempting to hide contraband. And had he – certainly had he successfully hidden the contraband, they would have had to go to a different search method, either calling in medical personnel or putting him in a dry cell and waiting to see what happened. But their decision, because – And as the district court credited Officer Gibbs, the baggie was still visible, and their decision to remove the baggie simply wasn't unreasonable under all those circumstances. Let me ask you this question, because your colleague in opposing counsel cited the Long Beach protocol in terms of getting a physician or a nurse in certain situations and suggested this would be one of them. Is that the case? And should they have proceeded in that way? And does the fact that they didn't make this unreasonable? I don't think that – First of all, with respect to the code section that Mr. Schlesinger cited, that was the first that that was right. So I'm not familiar with that particular code section. But I do know that the policy – the search policy for booking does require medical personnel to be brought in if there is a body cavity search. The fact that they – I just don't believe that the fact that they didn't at that moment in time, between struggling with the defendant, between trying to preserve the evidence – There is a testament about struggling, though. They just said that he tried – And actually, there was a question asked to the police officer. Wasn't the only way he could comply with your request to lean over and spread his – move his hands back? Because that's what they testified to, that he moved his hands back. And the police officer said yes. That was Harris. I'm sorry, Your Honor. By struggling, I mean he was not complying with their instructions. And there was testimony that earlier he was verbally aggressive. And they felt that they needed to use the taser. Then they have the defendant limp. Their decision not to call medical personnel at that point in time, under all of those circumstances, doesn't render the search improper. The point in time that I'm talking about is once they see the protrusion. Okay. You're saying they didn't need to call medical personnel. That's correct. Now, do you acknowledge that there could be some objects that would cause harm when extracted from that protrusion? Yes, Your Honor. If, for example, the defendant had secreted a shank or a knife or some other type of sharp object into his body cavity and the officers removed it without concern for his safety, then I think that would be crossing the line. But that's not what we have here. What we have here is a small baggie containing crack cocaine in it, which they just observed him insert into his anus. Actually, the testimony is that one of the officers had been told by the passenger in the front seat that he had already inserted something. The testimony of the officer was that they were told by the person in the front seat of the car when they arrested him that he had had some drugs in a baggie in his pants. Yes, and then during the course of the strip search, as they were instructing him to spread his buttocks, the testimony is that they observed him. Go to do that. Go to do that. I don't know if he actually did that. It isn't clear in the testimony that he actually shoved it. They don't testify that they actually saw him trying to do that. So let's just say it looks like he's doing that to them. Yes. So then that's what happens to them. They respond. Right. And you're saying because in this particular circumstance, it didn't appear to be an object or it was some sort of plastic or something. It was okay for them to remove it without the medical personnel. There was nothing that would have put them on notice that there was a danger involved from removing the item, whereas with perhaps a different item, there would have been notice to the officers that their conduct was dangerous. Your Honor, I apologize. I'm way over time. You are way over time. And if there's any issue, I'm going to give you the same opportunity. If there's any other issue that you want to address, you should address it. I would, Your Honor. First of all, with respect to the ruse calls, the record does not reflect that the ruse were the only nexus between Smith and Target Telephone Number 2. And the district court in her order, I believe, identifies a number of other connections between Target Telephone Number 2, Smith's mother, AMT, commonly called numbers, such that even if the statement about the ruse calls were eliminated from the affidavit, there would still be probable cause and necessity within the affidavit. If the search warrant goes, everything except the cocaine that was discovered at the jail goes, right? If the search warrant covers everything without an apartment as well, right? It's the result of it. If the search warrant goes, the digital scale and the 2.6 grams of crack go. There's still wiretap calls indicating drug sales. There's still the 0.61 grams that they struggled away from Lee. That's what I wanted to know. The wiretap does not go to the 0.61? The wiretap calls do go to the 0.61. Okay. All right. That's what I thought. Right. If the wiretap's okay, but the apartment search is not, what goes? The 2.6 and one count. Okay. Thanks. I just wanted to make sure I had all the pieces. Okay. All right. Intent and the mistrial. That's just what I was looking at in my notes, so I'll address that now. I think that the district court's finding that there was no specific intent here is not clearly erroneous. And the key to that, I think, is that the defense claims that the government basically washed their hands of how the marshals effectuated this arrest. And so if the government did wash their hands of the way that the marshals effectuated the arrest, then they could not have intended to guarantee goading the defendant into a mistrial. Because if they had washed their hands of it, And for all we know, the marshal would have waited an appropriate amount of time before arresting the witness. But in addition to that, the government argued against the mistrial in this case, and the government believed that a limiting instruction would have been sufficient to cure the problem in this case. Granted, the district court didn't agree with that, but the district court did credit the government with that as one of the indicia that their intent was not to provoke a mistrial here. Does the intent requirement have to be intent, or is it recklessness? I believe that it has to be a specific intent to goad them into requesting a mistrial, and that simply wasn't here. Although we can see that the matter could have been handled and should have been handled. It will be handled. Yeah, and in the future it will be handled differently, yes. And finally, with respect to the defense reliance on the Boisiac decision, I think that case is very distinct from the Long Beach hard drive here. With respect to the discovery violations, there's two items of evidence that are at issue. There's the chain of custody document, which was provided mid-trial, that the defense received a continuance for, that they were able to cross-examine with, and they were able to air that issue to the jury. And then during the process of the post-trial motions is when the issue of the hard drive came up. And during the process of the post-trial motions is when the district court ordered the Long Beach not to provide a copy of the hard drive. Long Beach was not in violation of an order by refusing to provide a copy of the hard drive. The district court ordered Long Beach to give the defense expert access to their database to allow him to run searches, et cetera. And the record shows that the defense expert's own declaration shows that he received a personal demonstration of how the database works. He conducted numerous interviews with Long Beach personnel about how the database works, and he propounded written questions and received answers to his questions about how the process works. Where Long Beach refused to go one step further was that the defense expert wanted a mirror image or a copy of the hard drive of their entire computer evidence processing database, which would have included cases beyond simply this one. And there's been no showing that the defendant was prejudiced by that because there's no showing that that would have undermined the chain of custody or the other evidence that was provided to him in accordance with the district court's orders. The court has no further questions. All right. What should we do with the eight-year supervised release issue? Oh, the eight-year supervised release issue, Your Honor, is actually a fairly simple one. Under the – I believe it's Berrigan. Under the Berrigan decision, it's clear that Section 841, its silence as to the statutory maximum for supervised release means that the maximum is life, and that that trumps Section 3583. And I believe that the statute has now been rewritten such that the actual language in 841 says, notwithstanding – I think it's 3583 – notwithstanding the Title 18 section, these are the terms for supervised release for offenses under this section. So it's not – My question – my problem's a little different. It's not – it's whether the judge actually said why she was giving the eight years because you have the eight years come from the pre-sentence report, which before the law changed, she's decided she's going to follow the new law, and then we've still got the eight years, and she really doesn't say anything about the eight years. Has she said enough? I think she has said enough because she does discuss the 3553A factors, and she has given a great deal of attention to this case. It's simply that she states her reason for the sentence imposed without delineating these are my reasons for getting time served and these are my reasons for making it eight years of supervised release, and I think that that's certainly sufficient. Okay. Anything else? No, thank you very much. All right. Thank you. Do you have anything you want to rebut? I'll give you a couple minutes. I know this is going way longer, but there's so many issues. This should not have been a seven-week case. This should have been like a ten-week case. We've given it ten weeks. We haven't given it a ten-week. We're going to give it in the future. I would disagree with the idea that if the bar tap was no good, some of the counts still can be affirmed because there was so much testimony. She said that. I think the only one is the body search that's left if the wiretap goes. I think that's what the prosecutor admitted. Well, but the jury was presented with all this wiretap evidence as part of the government's case in chief, so it's hard to say that you're just going to ignore that and then look at something else in isolation and say he's guilty of that because of the spillover effect of all of this evidence that was derived from the wiretap. And that's why our position is that if the wiretap is no good, that there's a reversal of all counts, not just that. Including the evidence that was found in his body. Well, yes, because they wouldn't have continued the investigation of him had they not started to develop probable cause to investigate. It's sort of the fruit of the poison's tree in the sense that if there was no wiretap of him, they wouldn't have even known of his existence because they were looking at Eddie Smith, who evidently was not using the wiretap. And as far as what was presented in the wiretap affidavit, just to go back to that very quickly, outside of the two ruse calls which they claimed identified Smith's voice to be attached to Target 2, there really isn't much left in the affidavit that would support probable cause. There's a suggestion that he was going to be using a new number, but the unidentified female he spoke to about that never called Target 2. The business about the subscriber being a corporation, that's sort of a neutral fact, doesn't go one way or the other in terms of probable cause. The fact that Target 2 was activated a year before Target 1 suggests that they repeated a claim that he was going to be using that as a new phone. The fact that they didn't even use their trusted informant to verify who was using that second phone is very telling, because had they used the informant, they would have known immediately that Smith was a relative of my client's, and this was why there were toll records that showed connections between the two phones, but otherwise Smith was not the user of the phone, and there was no independent probable cause as to my client at that point. So all you really had was the two ruse calls, and we now know that those calls were no good. What is the Long Beach Police Department code section regarding the search that you referenced? Oh, it's in my brief. I believe it's page 36. It's California Penal Code section 4030K, which is at page 38 of the opening brief, and in conformity with that section, the Long Beach Police Department's jail search policy required that any body cavity intrusion be conducted in sanitary conditions by either a physician, nurse practitioner, registered nurse, licensed vocational nurse, or emergency technician licensed to practice in the state, and of course Sergeant Gibbs was none of those. As far as the application itself is concerned, the government did cite a Sixth Circuit case, United States v. Florida, which dealt with the challenge of an unsworn affidavit. In that case, they said that section 2518 does not require the submission of affidavits. It merely requires that the written applications be submitted under oath and affirmation. This appears to be interesting because it goes back to the fact that the application is really an important part of the whole application process, that the oath that the investigating prosecutor takes as part of the application is a very key terminal point in the whole process of obtaining a wiretap, and what AUSA Rosenberg did was sort of like what the executive assistant did in the U.S. v. Chavez case before the Supreme Court when he was in properly delegated responsibility to act on behalf of the Attorney General, who was John Mitchell at the time. Having stepped in for Ms. Chesner, he had no familiarity with the investigation at that point. He was simply serving as a rubber stamp. There was also some discussion, possibly in the transcript, about the fact that maybe Ms. Chesner was not all that happy with the affidavit as it stood and that there might have been some argument at the motions hearing concerning the fact that she had her own reservations about the probable cause, which is really besides the point because what the court needs to look at is the affidavit itself to determine whether there was sufficient probable cause. The bottom line is that she wasn't there when it was presented to the judge for signing, and so the government bypassed what we maintain is a congressionally imposed limitation on the use of wiretaps because it dispensed with the important part of the application process under 2518A1, which is the oath requirement for the attorney who makes the application. All right. Well, I think you've covered everything. I think we've covered everything. So we will submit U.S. v. FOC.
judges: Restani, Wardlaw, Murguia